UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LIBERTY MUTUAL INSURANCE COMPANY,<br><br>Plaintiff,<br><br>-against-<br><br>DAY TO DAY IMPORTS INC., et al.,<br><br>Defendants. | 22-CV-02181 (AT) (RFT)<br><br>**OPINION & ORDER** |

**ROBYN F. TARNOFSKY, United States Magistrate Judge:**

Plaintiff Liberty Mutual Insurance Company ("Liberty") has moved for summary judgment on its claims against Defendants Day to Day Imports Inc., Oxgord Inc., and Stanzino Inc.; Plaintiff seek a declaratory judgment that Defendants are not entitled to coverage under an insurance policy for certain claimed losses. Defendants have cross-moved for partial summary judgment against Plaintiff on their counterclaims for bad faith, breach of the implied covenant of good faith and fair dealing, and unfair business practices, seeking a declaration that Plaintiff wrongfully denied coverage. Plaintiff and Defendants retained experts to offer opinions.

Pending before the Court are Defendants' motions under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), to exclude the reports and testimony of three experts presented by Plaintiff – Jon Fox, who opines on trucking capacity for long-haul shipments in 2021 (*see* ECF 138), Peter Curzio, who opines on the meaning of the term "goods in transit" in the marine insurance industry (*see* ECF 141), and Christopher J. Bonanti, who opines on regulatory compliance requirements for interstate shipping of hazardous materials (*see* ECF 144). Fox, Curzio, and Bonanti's opinions relate to Plaintiff's claims seeking a

declaration that Defendants' claimed losses were not covered under the relevant insurance policy; Curzio also opines on issues relating to Defendants' counterclaims.

Also pending before the Court are Plaintiff's *Daubert* motions to exclude the testimony of two experts presented by Defendants – Barry Zalma, who opines on whether Plaintiff's claims handling satisfied insurance industry standards and practices (*see* ECF 132), and Joseph B. Michels, who opines on, among other topics, how goods are customarily staged while awaiting transport and trucking capacity for long-haul shipments of hazardous materials after the COVID-19 pandemic (*see* ECF 135). Michels' opinions primarily relate to Defendants' counterclaims, although certain of his opinions are also relevant to Plaintiff's claims; Zalma's opinions relate to Defendants' counterclaims.

For the reasons set forth below, Defendants' motions to exclude Fox's and Curzio's reports, rebuttal reports, and testimony (ECF 138; ECF 141) are GRANTED IN PART AND DENIED IN PART as set forth below; Defendants' motion to exclude Bonanti's report, rebuttal report, and testimony (ECF 144) is GRANTED; Plaintiff's motion to exclude Michels' report, rebuttal report, and testimony (ECF 135) is GRANTED IN PART AND DENIED IN PART as set forth below; and Plaintiff's motion to exclude Zalma's report, rebuttal report, and testimony (ECF 132) is GRANTED.[1]

---

[1]     "Because *Daubert* motions are nondispositive of the litigation, they are routinely determined by magistrate judges, subject to clear error review by the district judge." *DoubleLine Cap. LP v. Odebrecht Fin., Ltd.*, No. 17-CV-4576 (DEH) (BCM), 2024 WL 1115944, at *3 n.4 (S.D.N.Y. Mar. 14, 2024); *see also Am. Empire Surplus Lines Ins. Co. v. J.R. Contracting & Env't Consulting, Inc.*, 743 F. Supp. 3d 530, 533 n.1 (S.D.N.Y. 2024).

**FACTUAL BACKGROUND**

The statement of facts for a *Daubert* motion to exclude expert opinions is generally drawn from the record, answers, and complaints. *See, e.g.*, *Navigators Ins. Co. v. Goyard, Inc.*, 608 F. Supp. 3d 44, 45 (S.D.N.Y. 2022) (citing to complaint and answer for background); *Am. Empire Surplus Lines Ins. Co. v. J.R. Contracting & Env't Consulting, Inc.*, 743 F. Supp. 3d 530, 533 (S.D.N.Y. 2024) (citing to declarations, complaint, and insurance policy).[2] Courts may also look to any statements of material facts ("SUMF") for related summary judgment motions. *See Better Holdco, Inc. v. Beeline Loans, Inc.*, 666 F. Supp. 3d 328, 345 n.1 (S.D.N.Y. 2023) (deciding a *Daubert* motion based on facts from an SUMF); *LoanCare, LLC v. Dimont & Assocs., LLC*, No. 22-CV-9286 (MMG), 2025 WL 951585, at *1 n.1 (S.D.N.Y. Mar. 28, 2025) (same).

This case arises out of a dispute over insurance coverage for losses due to a September 2021 fire outside a warehouse in Gardena, California (the "Gardena Facility"). The fire destroyed three categories of goods outside the Gardena Facility – items on outbound trailers awaiting transport ("Trailer Goods"), items in seven sea containers that were in the process of being unloaded and moved into the warehouse ("Container Goods"), and items that were not in trailers or sea containers that had been transported to the Gardena Facility at some time previously from a nearby warehouse ("Other Goods") (together, the Trailer Goods, the Container Goods, and the Other Goods are the "Destroyed Goods"). (*See* ECF 24, Am. Compl.

---

[2]     Unless otherwise indicated, this opinion and order omits internal quotation marks, alterations, and citations from quoted text.

("AC") ¶¶ 33-34, 38-40, 118, 124.)[3] Defendants allege that the fire also caused smoke, heat, and water damage to items stored inside the Gardena Facility (the "Inside Goods").

Plaintiff issued a marine cargo insurance policy (the "Policy"), effective from December 20, 2020 through December 20, 2021, to insure goods shipped by Defendants' distribution business. (*See* ECF 1-1, Policy at 1 (including, among the goods insured, household cleaning products and hand sanitizer).) The Policy provided coverage for goods in maritime and domestic transit as well as for goods stored in listed warehouses, including the Gardena Facility. (*See id.* at 1, 6.) The Policy's "Warehouse to Warehouse and Marine Extension Clause" provided, in relevant part:

> This insurance attaches from the time the insured goods leave the warehouse and/or place named in the policy for the commencement of the transit and continues during the ordinary course of transit, including customary transshipment points, until the goods are delivered to the final warehouse at the

---

[3]    The parties use different terms for the goods outside the Gardena Facility that were destroyed in the fire.

Plaintiff uses "Sea Container" goods to refer to goods that had arrived in the days before the fire; Defendants have no term for such goods while I use the term "Container Goods." Plaintiff uses "Outbound Trailer" goods to refer to goods that were being unloaded at the time of the fire; Defendants have no term for such goods while I use the term "Trailer Goods." Defendants use the term "Container and Trailer Goods" to refer to goods that were in sea containers and trailers.

Plaintiff uses the term "Non-Containerized Outside Goods" to refer to goods on pallets at the time of the fire; Defendants use the term "Transit Goods" and I use the term "Other Goods."

Plaintiff uses the term "Outside Goods" to refer to all goods that were outside the Gardena Facility at the time of the fire; Defendants have no term for all such goods and I use the term "Outside Goods" as well. (*See* ECF 108, Pl.'s Memorandum in Support of Summary Judgment at 2, 18-20; ECF 113, Defs.' Memorandum in Support of Summary Judgment at 6-7, 12.)

destination named in the policy, certificate or declaration or a substitute destination . . . .

This insurance specifically covers the goods during: (i) deviation, delay, forced discharge, reshipment and transshipment . . . .

\*\*\*

It is a condition of this insurance that there shall be no interruption or suspension of transit unless due to the circumstances beyond the control of The Insured.

(*Id.* § 15, at 12-13.)

The Policy's "Consolidation / Deconsolidation" clause states, in relevant part:

Notwithstanding anything contained herein to the contrary (particularly the Warehouse to Warehouse and Marine Extension Clause) it is understood and agreed the insurance provided hereunder shall cover the goods while being temporarily stored on premises of freight forwarder, consolidators, truckers, warehousemen, steamship lines, or others, for the purpose of consolidation, deconsolidation, containerization, decontainerization, distribution and/or redistribution whether prior to loading and/or after discharge from overseas vessels/aircraft for a period not exceeding Thirty (30) days after arrival at such premise.

(*Id.* § 16, at 13.)

The Policy contains two endorsements relevant to the pending *Daubert* motions. The Domestic Transit Coverage Endorsement extends to "insured property while in the ordinary course of transit by land or air within the continental limits of the United States and Canada" and "covers against all risks of physical loss or damage from any external cause irrespective of percentage, except the risks of war, strikes, riots, and other risks . . . ." (*Id.* at 43.) The Warehouse Storage Coverage Endorsement covers "property owned by the Insured . . . for which the Insured may be liable in the event of loss while temporarily stored within the

5

continental limits of the United States," as limited to warehouses approved in the Policy and excluding "[p]roperty stored outside or in the open." (*See id.* ¶¶ 1, 2, 3(l), at 46.)

On October 1, 2021, Defendant Day To Day sent Plaintiff a first notice of loss concerning the losses arising out of the fire, and Liberty acknowledged receipt of the notice. (ECF 24, AC ¶ 41; ECF 40, Ans. ¶ 41.) Liberty retained marine surveyor King Marine Surveying Company, Inc. ("King") to conduct an inspection of any damage to products inside the warehouse, and King first visited the site on October 4, 2021. (*See* ECF 24, AC ¶¶ 46, 48.) On October 5, 2021, Defendants retained Apex Public Adjusters ("Apex") to represent Defendants "with claims under the Policy" arising from the Gardena Facility fire. (*See* ECF 40. Ans. ¶ 186.)

Plaintiff issued a Reservation of Rights Letter on October 13, 2021 ("ROR") (*see* ECF 1-2, ROR), stating that it had "determined that [Defendant] Day to Day's goods stored outside the warehouse and/or in the open are excluded from coverage under the Policy." (*Id.* at 2.) Plaintiff paid a portion of Defendants' claimed loss on the Inside Goods. (*See* ECF 24, AC ¶¶ 66-67; ECF 40, Ans. ¶¶ 66-67.) On February 8, 2022, Apex "submitted their formal demand for coverage" for the Container Goods and Trailer Goods. (*See* ECF 109-1, Defs.' Response to Pl.'s SUMF ¶ 420.) On March 15, 2022, Defendants submitted a formal demand for coverage of the Other Goods. (*See id.* ¶ 425.)

Plaintiff took the position that the Policy does not cover the loss of the Destroyed Goods, because the Destroyed Goods were not "in the ordinary course of transit" at the time of the fire, as required under the Warehouse to Warehouse and Marine Extension Clause as well as the Domestic Transit Coverage Endorsement of the Policy. (*See* ECF 108, Plaintiff's Mem. of

6

Law in Support of Summ. J. ("Pl.'s S.J. Mem.") at 18-20.) Specifically, Plaintiff contended that the Container Goods had completed their transit (*see id.* at 18), the Trailer Goods had not yet begun their transit (*see id.* at 19), and the Other Goods had completed their transit and were stored outside the Gardena Facility (*see id.* at 19-20). Plaintiff also argued that even if all the Destroyed Goods were in transit, their accumulation outside the Gardena Facility was within Defendants' control, therefore voiding coverage under the Warehouse to Warehouse and Marine Extension Clause. (*See id.* at 20-22.)

Defendants responded that the Container Goods were in transit to the Gardena Facility because they had not yet been unpacked; that the Trailer Goods were in transit from the Gardena facility, because they were awaiting pickup; and that the Other Goods were in transit between a warehouse in Compton, California and a warehouse in Cherry Hill, New Jersey and had made a scheduled stop on the way at the Gardena Facility, meaning that the Gardena Facility was a "customary transshipment point[ ]" within the meaning of the Policy's Warehouse to Warehouse and Marine Extension Clause. (*See* ECF 115, Defs.' Mem. of Law in Opp. to Plaintiff's Mot. for Summ. J. ("Defs' S.J. Opp.") at 12-16.) Defendants contended that the condition of coverage that there be no "interruption or suspension of transit [unless] due to circumstances beyond the control of The Insured" did not preclude coverage for the loss of the Other Goods because the seven-month delay in onward transit from the Gardena Facility was due to circumstances beyond Defendants' control – namely, the lack of available trucks to transport the Other Goods as a result of the COVID-19 pandemic. (*See id.* at 16-17.)

**PROCEDURAL HISTORY**

Plaintiff filed a complaint initiating this action on March 16, 2022. (*See* ECF 1, Compl.)
Plaintiff filed the AC on June 30, 2022, seeking a declaratory judgment that, among other
determinations, Defendants are not entitled to coverage under the Policy for the claimed losses
for the Destroyed Goods or for damage to Inside Goods that allegedly suffered smoke or other
damage during the fire. (*See* ECF 24, AC ¶¶ 76-94; 102-27.) On July 28, 2022, Defendants filed
their answer and counterclaims alleging breach of contract, bad faith, breach of the implied
covenant of good faith and fair dealing, and unfair business practices. (*See* ECF 40, Ans. ¶¶ 207-
27.) Plaintiff answered the counterclaims on August 18, 2022. (*See* ECF 44.)

Following the close of discovery, Plaintiff moved for summary judgment, seeking a
declaration that, among other determinations, the Policy does not cover loss of the Destroyed
Goods, because those goods were not "in transit" or "in the ordinary course of transit" at the
time of the fire. (ECF 108, Pl.'s S.J. Mem. at 1.) Defendants cross-moved for partial summary
judgment on August 12, 2024, seeking a declaration that, among other determinations, Liberty
had wrongfully denied coverage of the loss of the Destroyed Goods and had wrongfully
adjusted the claims involving the Inside Goods. (*See* ECF 113, Defs.' Mem. in Supp. of Partial
Summ. J. ("Defs.' S.J. Mem.") at 6, 9, 12.) The parties' summary judgment motions were fully
briefed by September 23, 2024. (*See* ECF 120, Pl.'s Mem. in Opp. to Partial Summ. J. ("Pl.'s S.J.
Opp."); ECF 128, Defs.' Reply in Supp. of Partial Summ. J. ("Defs.' S.J. Reply"); ECF 115, Defs.' S.J.
Opp."; ECF 124, Pl.'s Reply in Supp. of Summ. J. ("Pl.'s S.J. Reply").)

Plaintiff subsequently moved to exclude the expert reports, rebuttal reports, and testimony of Defendants' experts Zalma (ECF 132) and Michels (ECF 135), and Defendants moved to exclude the expert reports, rebuttal reports, and testimony of Plaintiff's experts Fox (ECF 138), Curzio (ECF 141), and Bonanti (ECF 144). The parties' *Daubert* motions were fully briefed by December 10, 2024. Judge Analisa Torres referred the disposition of the *Daubert* motions to me for resolution. (*See* ECF 131, Order of Reference.)

## LEGAL STANDARDS GOVERNING *DAUBERT* MOTIONS

Trial courts serve as gatekeepers for expert evidence and are responsible for "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597. "The party seeking to introduce the expert testimony bears the burden of establishing by a preponderance of the evidence that the proffered testimony is admissible." *Sec. & Exch. Comm'n v. Yorkville Advisors, LLC*, 305 F. Supp. 3d 486, 503-04 (S.D.N.Y. 2018) (citing *Daubert*, 509 U.S. at 592). Although a district court has "broad discretion to carry out this gatekeeping function," *Navigators Ins. Co. v. Goyard, Inc.*, 608 F. Supp. 3d 44, 47 (S.D.N.Y. 2022), "exclusion remains the exception rather than the rule." *In re AXA Equitable Life Ins. Co. COI Litig.*, 595 F. Supp. 3d 196, 250 (S.D.N.Y. 2022), *on reconsideration in part*, No. 16-CV-0740 (JMF), 2022 WL 3018104 (S.D.N.Y. July 29, 2022).

Under Rule 702 of the Federal Rules of Evidence, which governs the admissibility of expert and other scientific or technical testimony or testimony based on specialized knowledge:

> [a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that: (a) the expert's

scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.

Rule 702 requires that "expert testimony rest on knowledge, a term that connotes more than subjective belief or unsupported speculation." *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 543 (S.D.N.Y. 2004) (quoting *Daubert*, 509 U.S. at 590). In assessing the admissibility of expert testimony under Rule 702, courts consider three factors: "(1) the qualifications of the expert to testify as to a particular matter, (2) the reliability of the methodology and underlying data employed by the expert, and (3) the relevance of the expert's testimony (*i.e.*, whether the expert's testimony as to a particular matter will assist the trier of fact)." *Bocoum v. Daimler Trucks N. Am. LLC*, No. 17-CV-7636 (JPC) (BCM), 2022 WL 902465, at *6 (S.D.N.Y. Mar. 28, 2022) (quoting *Nimely v. City of New York*, 414 F.3d 381, 396-97 (2d Cir. 2005)).

## I.    Expert Qualifications

"To determine whether a witness qualifies as an expert, courts compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony." *United States v. Tin Yat Chin*, 371 F.3d 31, 40 (2d Cir. 2004). "If an expert's training and experience are in a field closely related to the subject matter of the proposed testimony, that showing may be sufficient to meet Rule 702's qualification standards in appropriate circumstances." *In re M/V MSC FLAMINIA*, No. 12-CV-8892 (KBF), 2017 WL 3208598, at *4 (S.D.N.Y. July 28, 2017).

10

II.    **Reliability of the Expert's Opinion**

After concluding that a witness is qualified as an expert, a court then examines whether

"the expert's testimony both rests on a reliable foundation and is relevant to the task at hand."

*Washington v. Kellwood Co.*, 105 F. Supp. 3d 293, 305 (S.D.N.Y. 2015) (quoting *Daubert*, 509

U.S. at 597). "If the expert's testimony does not rest on traditional scientific methods, the court

may permit testimony where a proposed expert witness bases her testimony on practical

experience rather than scientific analysis." *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 43

(S.D.N.Y. 2016).

"An expert opinion requires some explanation as to how the expert came to his

conclusion and what methodologies or evidence substantiate that conclusion." *Riegel v.*

*Medtronic, Inc.*, 451 F.3d 104, 127 (2d Cir. 2006). Expert opinions should be excluded when the

flaw in the expert's reasoning or methodology is "large enough that the expert lacks good

grounds for his or her conclusions." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267

(2d Cir. 2002); *see also In re Zyprexa Prods. Liab. Litig.*, 489 F. Supp. 2d 230, 284 (E.D.N.Y. 2007)

("Subjective methodology, as well as testimony that is insufficiently connected to the facts of

the case, have been relied upon by appellate courts as grounds for rejection of expert

testimony."). Courts "must focus on the principles and methodology employed by the expert,

without regard to the conclusions the expert has reached." *Amorgianos*, 303 F.3d at 266.

Nonetheless, "conclusions and methodology are not entirely distinct from one another";

"nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit

opinion evidence that is connected to existing data only by the *ipse dixit* of the expert," and a

court may exclude expert testimony if it determines that "there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

"As the Second Circuit has noted, district courts should presume expert evidence is reliable." *UMG Recordings, Inc. v. Lindor*, 531 F. Supp. 2d 453, 456 (E.D.N.Y. 2007) (citing *Borawick v. Shay*, 68 F.3d 597, 610 (2d Cir. 1995)). "[D]oubts about whether an expert's testimony will be useful should generally be resolved in favor of admissibility . . . ." *In re Zyprexa*, 489 F. Supp. 2d at 285 (quoting *United States v. Jakobetz*, 955 F.2d 786, 797 (2d Cir. 1992)).

## III.    Relevance of the Expert's Opinion

The third prong of a Rule 702 analysis asks whether the expert's testimony "will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a); *see Washington,* 105 F. Supp. 3d at 307-08. This prong requires an assessment of whether the testimony is relevant to the issues in the case. *See, e.g.*, *Daubert*, 509 U.S. at 591 (explaining that the third prong "goes primarily to relevance"). Under Rule 401 of the Federal Rules of Evidence, evidence is relevant if it has a "tendency to make a fact more or less probable than it would be without the evidence." Fed. R. Evid. 401.

In deciding whether expert testimony will be helpful to the factfinders, the Court must assess whether the testimony "usurp[s] either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it." *United States v. Lumpkin*, 192 F.3d 280, 289 (2d Cir. 1999); *see also United States v. Bilzerian*, 926 F.2d

12

1285, 1294 (2d Cir. 1991) ("[E]xpert testimony may help a jury understand unfamiliar terms and concepts," but "[i]ts use must be carefully circumscribed . . . ."). While an expert "may opine on an issue of fact within the jury's province," an expert "may not give testimony stating ultimate legal conclusions based on those facts." *Bilzerian*, 926 F.2d at 1294; *see also Hygh v. Jacobs*, 961 F.2d 359, 363 (2d Cir. 1992) ("This circuit is in accord with other circuits in requiring exclusion of expert testimony that expresses a legal conclusion.").

Courts therefore exclude expert testimony that "provide[s] legal opinions, legal conclusions, or interpret[s] legal terms; those roles fall solely within the province of the court." *Highland Cap. Mgmt. L.P. v. Schneider*, 379 F. Supp. 2d 461, 470 (S.D.N.Y. 2005). Courts also exclude expert testimony that "supplant[s] the role of counsel in making argument at trial, and the role of the jury [in] interpreting the evidence." *Primavera Familienstiftung v. Askin*, 130 F. Supp. 2d 450, 529 (S.D.N.Y. 2001), a*brogated on other grounds by Casey v. Merck & Co.*, 653 F.3d 95 (2d Cir. 2011); *see also LinkCo, Inc. v. Fujitsu Ltd.*, No. 00-CV-7242 (SAS), 2002 WL 1585551, at *2 (S.D.N.Y. July 16, 2002) (rejecting an expert's report that "d[id] no more than counsel for the plaintiff w[ould] do in argument, i.e., propound a particular interpretation of [the] defendant's conduct"); *Scott*, 315 F.R.D. at 46-49 (finding that experts are not permitted to testify about the parties' motivations or intentions or to state ultimate legal conclusions).

"[A]n expert should not be permitted to express an opinion that is merely an interpretation of federal statutes or regulations, as that is the sole province of the Court." *DeGregorio v. Metro-N. R. Co.*, No. 05-CV-0533 (JGM), 2006 WL 3462554, at *3 (D. Conn. Nov. 1, 2006) (citing *United States v. Scop*, 846 F.2d 135, 140-42 (2d Cir. 1988)). Similarly, an expert

should not be permitted to opine on the proper construction of contract, which is a question of

law to be "interpreted according to general rules of contract interpretation." *Navigators Ins. Co.*

*v. Goyard, Inc.*, 608 F. Supp. 3d 44, 48 (S.D.N.Y. 2022) (citing *Olin Corp. v. Am. Home Assur. Co.*,

704 F.3d 89, 98 (2d Cir. 2012)). And an expert should not be permitted to opine about the

credibility of fact witnesses or their testimony. *See Nimely*, 414 F.3d at 397 (holding that it is a

"well-recognized principle of our trial system that determining the weight and credibility of a

witness's testimony . . . belongs to the jury"); *see also United States v. Dugue*, 763 F. App'x 93,

96 (2d Cir. 2019) (precluding testimony from an expert witness about the general credibility of

cooperating witnesses); *U.S. Sec. & Exch. Comm'n v. Collector's Coffee Inc.*, 552 F. Supp. 3d 427,

432-33 (S.D.N.Y. 2021) (rejecting expert testimony opining about the motive to lie of the other

party's key witness).

**IV.    Federal Rule of Evidence 403**

Expert testimony must comport with Rule 403, which allows for the exclusion of

relevant evidence "if its probative value is substantially outweighed by a danger of one or more

of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay,

wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

**V.    Admissibility of Rebuttal Reports**

"The scope of a rebuttal is limited to the same subject matter encompassed in the

opposing party's expert report, but district courts have been reluctant to narrowly construe the

phrase same subject matter beyond its plain language." *Scott*, 315 F.R.D. at 44. However,

rebuttal reports "must meet *Daubert*'s threshold standards regarding the qualifications of the

expert, sufficiency of the data, reliability of the methodology and relevance of the testimony." *Id.* (collecting cases). Like any expert report, rebuttal reports may not usurp the court's role in instructing the jury on the law. *Sec. & Exch. Comm'n v. Lek Sec. Corp.*, No. 17-CV-1789 (DLC), 2019 WL 1304452, at *3-4 (S.D.N.Y. Mar. 21, 2019) (finding a rebuttal report that instructed the jury on the law to be inadmissible). "Nor may the rebuttal expert witness usurp the role of the trial court to act as gatekeepers to ensure the relevance and reliability of all expert testimony." *Capri Sun GmbH v. Am. Beverage Corp.*, 595 F. Supp. 3d 83, 139 (S.D.N.Y. 2022); *see also Washington*, 105 F. Supp. 3d at 307 ("[W]hile a district court has broad latitude in deciding both how to determine reliability and in reaching its ultimate reliability determination, it may not abandon its gatekeeping function.").

A rebuttal report could be excluded while the initial report is admitted, *see City of New York v. FedEx Ground Package Sys., Inc.*, No. 13-CV-9173 (ER), 2018 WL 4961455, at *5 (S.D.N.Y. Oct. 15, 2018), or a rebuttal report may be admitted while the initial report is excluded, *see Allen v. Koenigsmann*, No. 19-CV-8173 (LAP), 2023 WL 11803060, at *6 (S.D.N.Y. Mar. 30, 2023). However, because rebuttal reports often involve similar opinions from the same experts and face very similar requirements, they often meet the same or nearly the same fate as the initial report from the corresponding expert. *See, e.g.*, *In re M/V MSC FLAMINIA*, 2017 WL 3208598, at *23 (noting that "[the expert's] rebuttal report suffers from the same problem that plagues his primary report").

**DISCUSSION**

I.    **Liberty's Experts**

    A.    <u>Jon Fox</u>

        1.  Background and Opinions

Liberty offers Fox as a logistics expert whose testimony is relevant to whether it was beyond Defendants' control that the Destroyed Goods had not been transported from California to New Jersey between March and September 2021, before the fire. (*See* ECF 148, Pl.'s Opp. to Mot. To Exclude Fox Rep. and Testimony ("Pl.'s Fox Opp.") at 4-5.) Plaintiff argues that Fox's opinions would help the factfinders assess whether the Policy's condition of coverage that there be "no interruption or suspension of transit unless due to the circumstances beyond the control of The Insured" (ECF 1-1, Policy § 15(e), at 13) precludes coverage for the loss of the Other Goods because the nearly seven-month delay in onward transit at the Gardena Facility was due to circumstances within Defendants' control. (ECF 148, Pl.'s Fox Opp. at 5.)

Fox has worked exclusively in the carrier and freight logistics industry for 18 years, including as a vice president at several freight brokerages and as the founder of his own logistics consultancy. (*See* ECF 140-1, Expert Report of Jon Fox ("Fox Rep.") at 3-4.) In reaching his opinions, Fox relied in part on data that he obtained from DAT Freight & Analytics ("DAT"), Backhaul Direct, and the American Truck Association ("ATA"),[4] including information about the

---

[4]      DAT "operat[es] the largest truckload freight marketplace in North America" and is a resource "used by freight brokers to find available truck capacity and used by trucking

number of trucks searching for loads to haul in the relevant "shipping lanes" and data about available capacity to haul hazardous material between California and New Jersey during the relevant period. (*See id.* at 6, 8-9.) Fox also relied on publicly available data. (*See id.* at 10-11.)

Fox opines that: (1) "[t]here was long-haul trucking capacity available for hire to move the shipments of hand sanitizer from Los Angeles, [California] to Cherry Hill, [New Jersey] during the time period of March 1, 2021, to September 30, 2021"; (2) "[t]here were resources and tools available to procure" interstate freight truck and rail capacity to move Defendants' goods from California to New Jersey, including goods, such as hand sanitizer, that are classified as hazardous materials; (3) he would have expected to see a documentary record of Defendants' alleged efforts to procure interstate trucking capacity to move the goods from California to New Jersey; and (4) the assertion of Defendants' freight brokers that there were no trucks available to move Defendants' goods from California to New Jersey during the relevant period is not credible. (*See id.* at 13-14.)

Fox submitted a rebuttal report that is nearly identical to his initial report to critique the report of Defendants' expert, Michels, who opines that the pandemic caused insufficient interstate trucking carriers to be available to transport Defendants' products from California to

---

companies to find loads to haul." (ECF 140-1, Fox Rep. at 6.) Backhaul Direct "is a domestic and international logistics provider [ ] specializ[ing] in freight brokerage[.]" (*Id.* at 8.) The ATA is a national trade association for the trucking industry. (*See id.* at 9.) It "maintain[s] and develop[s] a library of industry statistics, reports, and data in combination with data from the Federal Motor Carrier Safety Administration's Motor Carrier Management Information System." (*Id.*)

New Jersey. (*See* ECF 140-5, Fox Rebuttal Rep. at 6-15.) Fox's rebuttal report contains two new

sections, both of which opine that Michels' report lacks supporting evidence. (*See id.* at 6, 14.)[5]

   2.  Analysis

      a.  *Qualifications*

Defendants argue that Fox is unqualified to offer "any . . . opinion pertinent to the issues

in this case," because he has not previously testified about, consulted on, or published studies

"specific to the issues." (ECF 139, Defs.' Mem. in Supp. of Mot. To Exclude Fox Rep. and

Testimony ("Defs.' Fox Mem.") at 6.) Plaintiff responds that Fox's "experience and background

in logistics and freight transportation" are sufficient to establish his qualifications as an expert

witness under Rule 702. (*See* ECF 148, Pl.'s Fox Opp. at 8.)

Fox's experiential qualifications in transportation logistics are closely related to whether

trucks were available for long-haul shipping of Defendants' goods during the relevant period. I

therefore conclude that Fox satisfies the *Daubert* inquiry into his qualifications as an expert.

*See, e.g.*, *Arista Recs. LLC v. Lime Grp. LLC*, No. 06-CV-5936 (KMW), 2011 WL 1674796, at *3

(S.D.N.Y. May 2, 2011) ("If the expert has educational and experiential qualifications in a

general field closely related to the subject matter in question, the court will not exclude the

---

[5]     Fox's opinions, if not excluded, would be considered only if the Court determines that
the Other Goods were no longer in transit at the time of the fire. If the Court decides that the
Other Goods were still in transit, there would be no reason to assess whether there had been
an interruption, suspension, or delay in transit that was within Defendants' control and that
therefore could preclude coverage. (*See* ECF 1-1, Policy §§ 7, 15(e), at 10, 13.)

testimony solely on the ground that [he] lacks expertise in the specialized areas that are directly pertinent.").

> b. *Reliability*

Defendants argue that Fox's opinion is unreliable because (1) Fox impermissibly relied on his hearsay conversations with contacts at freight brokerages; (2) Fox failed to consider the "global supply chain disruption in and prior to September 2021"; and (3) his analysis failed to consider the volume of goods that Defendants sought to transport and relied on available motor carriers rather than available trucks, which are a subset of motor carriers. (ECF 139, Defs.' Fox Mem. at 7-12.)

As to Defendants' position that Fox's conversations with DAT and Backhaul Direct, which provide some of the bases for his opinions, were inadmissible hearsay (*see* ECF 139, Defs.' Fox Mem. at 10-11), "expert analysis is often based on reported information rather than firsthand knowledge, and that is no bar to its admissibility." *MacQuesten Gen. Contr., Inc. v. HCE, Inc.*, No. 99-CV-8598 (JCF), 2002 WL 31388716, at *2 (S.D.N.Y. Oct. 22, 2002). Any objection to the information on which Fox relied, including his conversations with his contacts in the freight brokerage industry, "goes to the weight rather than the admissibility" of the expert testimony. *Id.*

As to Defendants' contention that Fox failed to account for "global supply chain disruption" during the COVID-19 pandemic (ECF 139, Defs.' Fox Mem. at 12), Defendants neglect to explain their basis for concluding that any disruption was not necessarily and implicitly incorporated into the point-in-time data about available carriers, on which Fox relied.

19

(*See* ECF 148, Pl.'s Fox Opp. at 20 (arguing that "Fox's opinions necessarily incorporate consideration of COVID-19's effect on the supply chain") (citing ECF 140-2, Fox Tr. at 98:19-99:15).)

Defendants' assertion that Fox neglected to consider the volume of goods Defendants sought to transport is undercut by Fox's testimony that he considered the availability of transportation for "truckloads" of hand sanitizer. (*See* ECF 140-2, Fox Tr. at 17:12-21.) Defendants pivot to arguing that Fox's methodology was incomplete because Fox estimated the volume of goods to be transported as "truckloads" rather than calculating the precise amount of hand sanitizer to be transported; Defendants conclude that Fox's analysis did not reflect the appropriate number of shipments needed to transport their goods. (*See* ECF 139, Defs.' Fox Mem. at 7-8.)

Defendants' contention that Fox's conclusions rely on an overly general description of the amount of goods to be freighted goes to the weight rather than the admissibility of his testimony. *See Bernhard-Thomas Bldg Sys, LLC v. Weitz Co, LLC*, No. 04-CV-1317 (CFD), 2010 WL 4929029, at *2 (D. Conn. Nov. 30, 2010) (concluding that an expert's use of "speculative estimates or some imprecision" goes to the weight of the evidence). "Unless the information or assumptions that plaintiff's expert[ ] relied on were so unrealistic and contradictory as to suggest bad faith, inaccuracies in the underlying assumptions or facts do not generally render an expert's testimony inadmissible." *R.F.M.A.S., Inc. v. So.,* 748 F. Supp. 2d 244, 269 (S.D.N.Y. 2010) (quoting *Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC*, 571 F.3d 206, 214 (2d Cir.2009)).

There is no indication that Fox's estimates were made in bad faith. As such, "[v]igorous cross-examination" and "presentation of contrary evidence" are "the traditional and appropriate means" to attack Fox's opinions. *Daubert*, 509 U.S. at 596; *see also R.F.M.A.S.,* 748 F. Supp. 2d at 269 (describing the tools that an opposing party can use at trial to "call[ ] into question the weight that the jury should accord [an expert's] testimony"). "[O]ur adversary system provides the necessary tools for challenging reliable, albeit debatable, expert testimony." *Amorgianos*, 303 F.3d at 267. Fox's use of estimates is not a basis for exclusion of his report or testimony.

Nor does Defendants' position that Fox's analysis improperly relied on data about available carriers rather than available trucks (*see* ECF 139, Defs.' Fox Mem. at 8-9) support excluding Fox's report or testimony. At bottom, this critique is not of Fox's methodology but rather of his conclusions – Defendants contend that Fox should not have relied on data about available carriers because they disagree that carrier availability corresponds to the availability of truckers to transport Defendants' goods. But "the possibility that a different conclusion could be drawn" from the same data "does not undercut the reliability of the conclusion that was drawn, as long as the expert has good grounds for the chosen interpretation." *United States v. Morgan*, 53 F. Supp. 3d 732, 741 (S.D.N.Y. 2014), *aff'd*, 675 F. App'x 53 (2d Cir. 2017).

Fox has such good grounds for his conclusion: shipment history data show that nearly 3,000 full truckloads were transported on the Los Angeles to Philadelphia shipping lane during the relevant period (*see* ECF 140-2, Fox Tr. 51:20-52:16), indicating that the freight brokers were capable of securing capacity for interstate shipments during that time (*see id.* at 51:20-

52:13), including for shipments of hazardous materials (*see id.* at 63:16-68:17). Under the circumstances, there is no basis to conclude there is "too great an analytical gap between the data and the opinion proffered" to admit Fox's opinion. *Gen. Elec. Co.*, 522 U.S. at 146 (finding that the district court did not abuse its discretion in refusing to admit expert testimony that the plaintiff's lung cancer was caused by certain chemicals based on a study involving a different form of cancer in mice).

### c.  Relevance

To the extent that Fox questions the credibility of Defendants' freight brokers' testimony that there were no available trucks to move the Other Goods to Cherry Hill, New Jersey before the fire, Fox's opinion impermissibly usurps the factfinders' role. *See, e.g.*, *Nimely*, 414 F.3d at 397. To the extent that Fox's rebuttal is identical to his initial report, it shares the same fate as his opening report. *See Micone v. Sarene Servs., Inc.*, No. 20-CV-3273 (NJC) (ST), 2025 WL 736638, at *57-59 (E.D.N.Y. Mar. 8, 2025). Thus, opinions on the credibility of Defendants' freight brokers are stricken from Fox's rebuttal report.

Fox's rebuttal opinion that Michels' opinion on the availability of trucks lacks supporting evidence is not borne out by a review of Michels' report, which bases its conclusion on the depositions of Pinchus Oberlander, an independent middleman between the customer and the trucking company, and Akiva Nourollah, the president of Day to Day imports (*see* ECF 137-1, Expert Report of Joseph Michels ("Michels Rep.") at 23, 25.) "To the extent that . . .  Plaintiff[ ] find[s] these sources weak or insufficient, [it] can challenge his testimony on cross-examination." *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 638 F. Supp.

3d 227, 296 (E.D.N.Y. 2022); *see also In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, No. 14-MD-2542 (VSB), 2025 WL 354671, at *38 (S.D.N.Y. Jan. 30, 2025). Fox's opinion on rebuttal – that Michels' conclusion about the unavailability of trucks was not supported by evidence – should be stricken. *See Pearlstein v. Blackberry Ltd.*, No. 13-CV-7060 (CM), 2021 WL 4131646, at *9-10 (S.D.N.Y. Sept. 10, 2021) (holding that "[a] rebuttal expert actually needs to be quite precise about the aspects of an expert's report with which he takes issue" and striking the rebuttal expert's vague accusations of cherry picking). However, Fox may testify as to the specifics of why he believes Michels' opinion is not supported by the evidence. *See id.* at *10 (holding that the rebuttal expert whose accusations of cherry picking were stricken for vagueness could testify as to specific facts that the initial report wrongly emphasized or de-emphasized).

****

Accordingly, as set forth above, Defendants' motion to exclude Fox's reports and testimony (ECF 138) is GRANTED IN PART, in that Fox's opinion that the testimony of Defendants' freight brokers is not credible is stricken from Fox's reports, and Fox may not testify on the credibility of the freight brokers' testimony; and the motion is further GRANTED IN PART, in that Fox's opinion that Michels' opinion on the availability of trucks lacks supporting evidence is stricken from Fox's reports, and Fox may not testify that Michels' opinion on the availability of trucks lacks supporting evidence, although Fox may testify as to the specifics of

why he believes Michels' conclusions were not supported by the evidence. The motion is

otherwise DENIED IN PART.[6]

    B.    <u>Peter Curzio</u>

        1.  Background and Opinions

Liberty retained Curzio to opine on whether Defendants' goods that were kept outside

the Gardena Facility were "goods in transit," based on Curzio's knowledge of marine cargo

claims and custom and usage in the insurance industry, including industry practice regarding

claims investigation and adjustment. (*See* ECF 143-2, Expert Report of Peter A. Curzio ("Curzio

Rep.") at 1.) Plaintiff asserts that Curzio's opinions are relevant both to whether the loss of the

Destroyed Goods was covered under the Policy and to Defendants' counterclaims concerning

Plaintiff's handling of Defendants' claim. (*See* ECF 149, Pl.'s Opp. to Mot. To Exclude Curzio Rep.

and Testimony ("Pl.'s Curzio Opp.") at 1-2.)

Curzio worked in the marine insurance industry for over 40 years, including at five

leading marine insurers, and was responsible for investigating and adjusting claims under

marine insurance policies. (*See* ECF 143-2, Curzio Rep. at 1-2.) He has also served on several

---

[6]    The opinions that are not excluded relate only to whether the Policy's condition of coverage that there be "no interruption or suspension of transit unless due to the circumstances beyond the control of The Insured" (ECF 1-1, Policy § 15(e), at 13) precludes coverage for the loss of the Other Goods because the delay in onward transit was due to circumstances within Defendants' control. (*See* ECF 148, Pl.'s Fox Opp. at 5.) Therefore, Fox's opinions would be considered only if the Court determines that the Other Goods were no longer in transit at the time of the fire; otherwise, there would be no reason to determine whether any delay in transit was within Defendants' control.

committees of the American Institute of Marine Underwriters, an organization that represents marine insurers, and has conducted training seminars on cargo policies and proper claims adjustment practices. (*See id.* at 2-3.) In preparing his report, Curzio reviewed, among other materials, the Policy, deposition transcripts, Defendants' bills of lading, documents produced by the parties, the reports of Plaintiff's other experts, and case law provided by Plaintiff's counsel. (*See id.* at 4.)

Curzio opines that it is consistent with marine insurance industry custom and practice for a claims adjuster to deny coverage for goods that are claimed by the insured to be in transit when there is no commercial documentation to support the "in transit" status of the goods – that is, documentation showing where the goods came from and where they were going. (ECF 143-2, Curzio Rep. at 8.) Curzio therefore concludes that it was reasonable for a marine claims adjuster to deny Defendants' claim for the loss of the Outside Goods under the Warehouse to Warehouse and Marine Extension Clause and the Domestic Transit Coverage Endorsement, because Defendants did not produce commercial invoices or import documentation showing that those goods were in transit. (*See id.*) Specifically, Curzio opines that: (1) the Container Goods were not in transit because their final destination was the Gardena Facility, the Warehouse to Warehouse and Marine Extension Clause "defines final destination as *to* the final warehouse rather than *in* the final warehouse," and any delay in unloading the goods from the containers and moving them inside the warehouse would be deemed within Defendants'

25

control, placing those goods outside the scope of coverage (*id.* at 13-15 );[7] (2) the Trailer Goods were not in transit, because "transit had . . . not yet commenced for the trailers at the time of the fire" (*id.* at 14);[8] and (3) the Other Goods were not in transit, because there is no valid evidence that at the time of the fire, the Other Goods had been en route between the warehouse in Compton, California and the warehouse in Cherry Hill, New Jersey, with a scheduled stopover at the Gardena Facility that lasted longer than anticipated for reasons outside Defendants' control (*see id.* at 9, 13-14). Finally, Curzio opines that it is unheard of in the insurance industry for a marine claims adjuster "to personally investigate a loss which is not [the marine claim adjuster's] area of expertise" (*id.* at 16), an opinion relating to Defendants' counterclaims for insurer bad faith, breach of implied covenants of good faith and fair dealing, and unfair business practices.

---

[7]    Curzio concludes that the Gardena Facility was the final destination based on correspondence dated February 23, 2022 stating that the Container Goods "were inbound . . . for unloading" at the Gardena Facility (ECF 143-2, Curzio Rep at 77-78). Curzio states, additionally, that goods are in the "[o]rdinary course of transit . . . where the trucking conveyance is in motion," and out of the control of the insured, and that the Container Goods were no longer in transit when the "wheels on the conveyances in question had . . . stopped turning with no future movement by the trucking conveyance anticipated." (*Id.* at 12-13.)

[8]    Curzio opines that the Trailer Goods were no longer in transit because there was no "documentary evidence to support [Defendants'] allegation that the trailers were fully loaded and awaiting outbound transit"; the trailers were "static," which Curzio interprets to mean that transit had not begun under the Policy's Warehouse to Warehouse and Marine Extension Clause. (ECF 143-2, Curzio Rep. at 13-14.)

On April 12, 2024, Curzio submitted a rebuttal report opining that Defendants' expert, Zalma, is not qualified to opine on marine insurance industry custom and practice in connection with Defendants' counterclaims. (*See* ECF 134-15, Curzio Rebuttal Rep.)[9]

### 2. Analysis

#### a. Qualifications

Defendants do not challenge Curzio's qualifications to provide expert testimony. (*See generally* ECF 142, Defs.' Mem. in Supp. of Mot. To Exclude Curzio Rep. and Testimony ("Defs.' Curzio Mem.").) Curzio's 40 years of experience in the marine insurance industry are sufficient

---

[9]     Plaintiff argues that New York law applies to all claims and counterclaims. Defendants do not expressly dispute that New York law applies to Plaintiff's claims, but they assert that California law applies to their counterclaims. (*See* ECF 153, Pl.'s Zalma Reply at 13.) "Under the choice-of-law rules of New York, as the forum state, such implied consent is sufficient to establish choice of law." *In re AXA Equitable Life Ins. Co. COI Litig.*, 595 F. Supp. 3d 196, 216 (S.D.N.Y. 2022) (citing *Alphonse Hotel Corp. v. Tran*, 828 F.3d 146, 152 (2d Cir. 2016)), *on reconsideration in part*, No. 16-CV-0740 (JMF), 2022 WL 3018104 (S.D.N.Y. July 29, 2022). Even absent implied consent, Plaintiff is correct that New York law governs the contract claims involving the Policy. *See Exist Inc. v. Tokio Marine Am. Ins. Co.*, No. 22-CV-1679 (AT), 2025 WL 252912, at *6 (S.D.N.Y. Jan. 21, 2025) (concluding, on similar facts, that New York law applied to contract claims in dispute involving an inland marine policy where the insured party was domiciled out-of-state, the loss occurred out-of-state, and the policy was endorsed in New York).

Under governing New York law, Curzio's opinions on the meaning of Policy terms, if not excluded, would be considered if the Court determines that the Policy is ambiguous on whether the Destroyed Goods were "in transit" or "in the ordinary course of transit"; interpretation of an unambiguous contract is left to the Court, without a role for the factfinder. *See Morgan Stanley Grp. v. New England Ins. Co.*, 225 F.3d 270, 275-76 (2d Cir. 2000) ("Once a court concludes that an insurance provision is ambiguous, the court may accept any available extrinsic evidence to ascertain the meaning intended by the parties during the formation of the contract."); *Ezrasons, Inc. v. Travelers Indem. Co.*, 89 F.4th 388, 396 (2d Cir. 2023) ("[I]f the contract is ambiguous, then relevant extrinsic evidence should be admitted and considered by the factfinder to resolve the ambiguity.").

to qualify him as an expert on industry practice. *See, e.g.*, *In re M/V MSC FLAMINIA*, 2017 WL 3208598, at *4; *Am. Empire Surplus Lines Ins.*, 743 F. Supp. 3d at 538-39.

b. *Reliability*

Defendants do not appear to make reliability (as opposed to relevance) challenges to Curzio's opinions about industry practice in connection with interpreting Policy terms. Defendants do argue that Curzio based one conclusion – that Liberty's hiring of an investigator on whom the claims adjuster relied, aligned with industry custom and practice – on subjective opinion rather than industry expertise. (*See* ECF 142, Defs.' Curzio Mem. at 10.) But Curzio's opinion on whether Plaintiff's claims handing comported with industry custom and practice is an appropriate subject for expert testimony and will necessarily draw on Curzio's experiences in the industry. *See Am. Empire Surplus Lines Ins.*, 743 F. Supp. 3d at 538-39 ("If the expert has educational and experiential qualifications in a general field closely related to the subject matter in question, the court will not exclude the testimony solely on the ground that the witness lacks expertise in the specialized areas that are directly pertinent."); *In re Longtop Fin. Techs. Ltd. Sec. Litig.*, 32 F. Supp. 3d 453, 463 (S.D.N.Y. 2014) (holding that a CPA with 30 years of experience could testify as to "what normally occurs when an auditor identifies fraud risk factors").

c. *Relevance*

Defendants argue that Curzio impermissibly interprets the Policy and offers no insight into relevant insurance industry custom that would assist the Court or the factfinders. (*See* ECF 142, Defs.' Curzio Mem. at 6.) Defendants note that courts routinely strike expert reports that

interpret insurance policies and urge this Court to do the same. (*See id.*) Defendants also contend that Curzio impermissibly supplants the factfinders when he concludes that there is "no evidence" to support Defendants' claims that the Container Goods were in transit. (*See id.* at 8-9.) Plaintiff responds that Curzio's interpretation of the phrases "in the ordinary course of transit," "in transit," and "due course of transit" are admissible expert opinions on industry usage. (ECF 149, Pl.'s Curzio Opp. at 14.) Plaintiff contends that Curzio's opinions about the marine insurance industry's understanding of the relevant Policy clauses are directly related to whether the actions of its claims handler "were consistent with industry custom and practice." (*Id.* at 9.) Defendants' response is to reiterate that Curzio's report is contract interpretation couched as claims handling testimony. (*See* ECF 156, Defendants' Reply in Supp. of Mot. To Exclude Curzio Rep. and Testimony at 1-2.)

While Plaintiff characterizes Curzio's opinions about Policy terms relating to the loss of the Destroyed Goods as discussions of industry practice and custom, Defendants are correct that his opinions are thinly veiled conclusions about the proper interpretation of disputed provisions of the Policy. An expert's interpretation of disputed coverage terms in an insurance policy risks "tell[ing] the jury what result to reach, and thus attempts to substitute the expert's judgment for the jury's." *Am. Home Assur. Co. v. Merck & Co.*, 462 F. Supp. 2d 435, 448 (S.D.N.Y. 2006) (quoting *Nimely*, 414 F.3d at 397). Such testimony may be properly excluded, and Courts in this District have limited such testimony to the custom and practice that inform the expert's conclusion and have excluded the conclusion itself. *See Am. Home Assur.*, 462 F. Supp. 2d at 449 (limiting an insurance expert's testimony "to what he understands to be the

standard practices and customs of his business and . . . the standard expectations of the insurer and insured"); *Am. Empire Surplus Lines Ins. Co.*, 743 F. Supp. 3d at 543 (concluding that an expert would not be permitted "to testify about his interpretation of the [insurance policy], and any other legal conclusions," but would be permitted to provide testimony about the insurance industry and opinions based on hypotheticals).

Certain of Curzio's opinions – on the meanings of disputed Policy terms, on whether a claims handler would reasonably have denied Plaintiff's coverage claims for the Destroyed Goods because the Policy did not cover loss of the Destroyed Goods, and on whether Defendants have adequately supported their insurance claims under the Policy for loss of the Destroyed Goods – impermissibly infringe on the roles of the Court and the factfinders and must therefore be excluded. *See Am. Empire Surplus Lines Ins.*, 743 F. Supp. 3d at 543-44 (concluding that, notwithstanding an insurance expert's qualifications to testify on practice and custom, the expert improperly reached legal conclusions when discussing the scope and limits of coverage and interpreting the insurance policy).

However, Curzio's opinions about industry custom and practice, including but not limited to industry practice for documenting that goods had been shipped from outside the country and industry practice for documenting that goods were at a transshipment point between the point of origin and the destination could be helpful to the factfinders if the Court finds that the Policy is ambiguous on whether any of the Destroyed Goods were "in transit" or "in the ordinary course of transit" at the time of the fire. *See In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d at 541 ("[A]n expert may give an opinion to help the jury decide an issue in the case,

[but] he or she may not tell the jury what result to reach . . . ."); *see also Bennett v. Target Corp.*, No. 16-CV-5816 (ADS) (SIL), 2018 WL 5784354, at *8 (E.D.N.Y. Nov. 5, 2018) (finding that an expert report "contain[ed] numerous inadmissible conclusions of law" but also "numerous factual assertions and conclusions founded primarily upon [the expert's] experience in the retail safety and design industry," which should be admitted).

As to Curzio's opinion on whether Plaintiff's claims handing comported with industry custom and practice, and in particular whether it was customary for a claims adjuster to hire an investigator to investigate the claim, that opinion is an appropriate subject for expert testimony. *See In re Platinum-Beechwood Litig.*, 469 F. Supp. 3d 105, 116-18 (S.D.N.Y. 2020) (finding that an expert may not testify as to disputed law but may testify as to background information such as "what a fiduciary or investment manager in a given context would ordinarily do according to relevant industry standards"). However, Plaintiff's insistence that Curzio's opinions to support its defense to Defendants' counterclaims (that Plaintiff's adjuster "acted in accordance with industry custom and practice") must be assessed "in the context of . . . the industry understanding of the coverages provided by [relevant policy] clauses, and the customary manner in which a claim is established under the respective clauses" (ECF 149, Pl.'s Curzio Opp. at 9) – is a transparent effort to put Curzio's opinions on a key legal issue in this case (that is, whether the claimed losses are covered by the Policy) before the factfinders. As such, it must be rejected, and Curzio is permitted to opine on whether Plaintiff's claims handling practices were consistent with industry standards, but only without reference to the meaning of any disputed Policy provisions.

Curzio offers five opinions in his rebuttal report, each of which questions a different aspect of Zalma's qualifications. But an expert "may not opine on the qualifications of another expert to testify on a particular subject," as "[t]hat . . . is a judicial function." *Capri Sun*, 595 F. Supp. 3d at 142; *see also Carroll v. Trump*, No. 22-CV-10016 (LAK), 2023 WL 2652636, at *2 (S.D.N.Y. Mar. 27, 2023) (holding that one expert's views of another expert's qualifications "are not proper subjects of expert testimony at all" and finding that portion of a rebuttal report inadmissible). Curzio's rebuttal report should therefore be excluded.[10]

****

Accordingly, Defendants' motion to exclude Curzio's reports (ECF 141) is GRANTED IN PART, in that Curzio's opinions on the meanings of the Policy terms, including but not limited to the terms "in transit" and "in the ordinary course of transit" and on whether a claims handler would reasonably deny the claims in this case based on Policy provisions, and on whether Defendants have demonstrated that their losses were covered under the Policy, are stricken from his reports, and Curzio may not testify as to those subjects even in connection with opining on the sufficiency of Plaintiff's claims handling practices; and the motion is further GRANTED IN PART, in that Curzio's rebuttal report is excluded, and Curzio may not testify to the opinions therein. The motion to exclude is DENIED IN PART, in that Curzio's opinions about

---

[10]    The rebuttal report should be excluded for the independent reason that the report it rebuts, Zalma's, is excluded. *See infra* Part II.A.2; *see also Golden Unicorn Enters., Inc. v. Audible, Inc.*, 682 F. Supp. 3d 368, 381 (S.D.N.Y. 2023) (finding that the testimony of a rebuttal expert "must. . . be excluded as irrelevant" after the principal expert's testimony had been precluded); *FedEx Ground Package Sys., Inc.*, 2018 WL 4961455, at *5 (excluding a rebuttal report as irrelevant after the report that it rebutted was excluded).

industry custom and practice, including but not limited to industry practice for documenting that claims had been shipped from outside the country and for documenting that goods were at a transshipment point between the point of origin and the destination are not stricken from his reports, and Curzio may testify on those subjects; and the motion to exclude is further DENIED IN PART, in that Curzio's opinions on the sufficiency of Plaintiff's claims handling are not stricken from his reports, and he may testify on that subject, except to the extent that those opinions entail statements about the meanings of any disputed Policy terms. [11]

     C.     <u>Christopher Bonanti</u>

          1.  Background and Opinions

Liberty retained Bonanti to opine on "regulatory and compliance requirements associated with an . . . interstate hazardous materials shipment" by highway from California to New Jersey. (ECF 146-2, Expert Report of Christopher J. Bonanti ("Bonanti Rep.") at 3.) Plaintiff offers Bonanti's opinions to address whether the Other Goods, "while sitting in the outside yard areas of the Gardena warehouse, were in the ordinary course of transit from Compton, California to Cherry Hill, New Jersey, at the time of the fire." (ECF 150, Pl.'s Opp. to Mot. To Exclude Bonanti Rep. and Testimony ("Pl.'s Bonanti Opp.") at 9.) Relying in part on bills of lading

---

[11]     Curzio's remaining opinions that relate to whether the Destroyed Goods were "in transit" or "in the ordinary course of transit" within the meaning of the Warehouse to Warehouse and Marine Extension Clause of the Policy would be considered if the Court determines that the Policy is ambiguous on the meaning of those terms. *See Morgan Stanley Grp.*, 225 F.3d at 275-76; *Ezrasons*, 89 F.4th at 396. Curzio's remaining opinions on the sufficiency of Plaintiff's claims handling would be considered under any circumstances.

prepared for each shipment of goods between the Gardena Facility and New Jersey, Defendants contend that the Other Goods were in transit from the Compton Warehouse to New Jersey, with a scheduled stop at the Gardena Facility. (*See* ECF 113, Defs.' S.J. Mem. at 7; ECF 115 Defs' S.J. Opp. at 21.) Plaintiff responds that irregularities in the bills of lading identified by Bonanti demonstrate that the Other Goods were not "in transit" or in "the ordinary course of transit" at the time of the fire and therefore that the loss of the Destroyed Goods was not covered under the Policy. (ECF 150, Pl.'s Bonanti Opp. at 9.)

Bonanti has decades of experience "leading and managing regulatory, legislative, and infrastructure projects for all modes of transportation." (ECF 146-2, Bonanti Rep. at 37.) Bonanti based his opinions on his expertise in hazardous materials shipments, on state and federal regulations, and on his review of bills of lading produced by Defendants and deposition transcripts, among other materials. (*See id.* at 43-44.)

Bonanti originally offered 28 opinions, most of which stated that Defendants or their agents violated various regulations governing the transportation of hazardous material; he also opined about irregularities in Defendants' bills of lading that fell short of violating governing regulations. (*See id.* at 30-33.) Bonanti concludes that irregularities in the bills of lading show that the documents were "fabricated" to obfuscate the "real" reason that the Other Goods were in the courtyard of the Gardena facility, which Bonanti states was that Defendants "los[t] their lease" for the Compton Warehouse and subsequently moved the goods from Compton to the Gardena Facility. (ECF 146-2, Bonanti Rep. at 30.) After Defendants moved to exclude Bonanti's report and testimony on the ground, among others, that his opinions impermissibly

interpret applicable regulations, which is a function reserved to the Court (*see* ECF 145, Defs.'

Mem. in Supp. of Mot. To Exclude Bonanti Rep. and Testimony ("Defs.' Bonanti Mem.") at 6-7),

Plaintiff withdrew 14 of Bonanti's opinions but continued to rely on the remaining 14 opinions

(the remaining opinions are numbered 6, 7, 12, 13, 15, 17, 18, 19, 20, 21, 24, 25, 26 and 27).

(*See* ECF 150, Pl.'s Bonanti Opp. at 11-14.)

　　　　Bonanti also offers a rebuttal report criticizing the opinions of Defendants' expert,

Michels, who opines that the Container Goods and Other Goods had been staged for shipping

rather than storage. (*See* ECF 146-3, Bonanti Rebuttal Rep. at 5.) Bonanti faults Michels for

failing to consider relevant regulations governing the transportation of hazardous materials,

which Bonanti says support the conclusion that the Container Goods and Other Goods were

being stored and not staged for further transit. (*Id.* at 6.)[12]

　　　　2.　Analysis

　　　　　　*a.　Qualifications and Reliability*

　　　　Defendants do not challenge Bonanti's qualifications to provide expert testimony. (*See*

*generally* ECF 145, Defs.' Bonanti Mem.) Defendants also do not challenge Bonanti's reliability

beyond stating that "[e]xpert testimony is neither relevant nor reliable where it seeks to usurp

the role of the trial judge." (*Id.* at 3.)

---

[12]　　Bonanti's opinions, if not excluded, would be considered if the Court determines that
the Policy is ambiguous on the definition of the terms "in transit" and "in the regular course of
transit." *See Morgan Stanley Grp.*, 225 F.3d at 275-76; *Ezrasons,* 89 F.4th at 396.

### b. Relevance

Defendants argue that four of Bonanti's remaining opinions (numbers 6, 13, 18, and 19) reflect impermissible legal conclusions. (*See* ECF 155, Defendants' Reply in Supp. of Mot. To Exclude Bonanti Rep. and Testimony ("Defs.' Bonanti Reply") at 3.)[13] I agree, and I further believe that five of Bonanti's other remaining opinions (15, 17, 20, 24, and 26) also reflect impermissible legal conclusions.[14] Bonanti's rebuttal critique of Michels for failing to consider relevant regulations governing the transportation of hazardous materials likewise rests on impermissible legal conclusions. Because a court should not permit an expert "to express an opinion that is merely an interpretation of federal statutes or regulations, as that is the sole province of the Court," *DeGregorio*, 2006 WL 3462554, at *3, Defendants' motion to strike

---

[13]    These opinions were that: the bills of lading were insufficient under Federal Motor Carrier Safety Administration regulations to allow for the transportation of the goods (*see* ECF 146-2, Bonanti Rep. ¶ 6, at 31); many of Defendants' pallets contained hazardous materials as defined by federal regulations, which would have required a qualified motor carrier (*see id.* ¶ 13, at 32), but the motor carriers listed on the bills of lading were not qualified; Defendants' bills of lading failed to identify the quantity of hand sanitizer on each pallet as required by federal regulations (*see id.* ¶ 18); and inconsistencies in the bills of lading meant that those documents failed to comply with federal regulations (*see id.* ¶ 19).

[14]    These opinions were that: Defendants Day to Day and Virgin Scent, which are listed on the bills of lading as motor carriers, were not qualified motor carriers authorized under federal law to transport hazardous materials (*see id.* ¶ 15); "there are no signatures . . . indicating [that] a qualified motor carrier took possession of the materials at the origination point in Compton, California," which materials were transported in rental trucks by Defendants' agents (*id.* ¶ 17); the bills of lading used the wrong packing classification in violation of federal regulations (*see id.* ¶ 20, at 33); goods are not in transit when the method of transportation fails to comply with governing regulations (*see id.* ¶ 24; *id.* at 9); and the bills of lading failed to comply with hazardous materials regulations requiring that shipping papers be dated on the date the shipment was offered and signed off on by a licensed motor carrier (*see id.* ¶ 26, at 33).

Bonanti's report (ECF 144) is GRANTED IN PART, in that opinions 6, 13, 15, 17, 18, 19, 20, 24, and 26 are stricken from the report, and Bonanti is precluded from testifying as to those opinions; and the motion is further GRANTED IN PART, in that Bonanti's rebuttal opinion is excluded, and Bonanti is precluded from testifying to the opinions therein.

In the remaining five opinions (7, 12, 21, 25, and 27), Bonanti states that the bills of lading: reflect more goods than could have been transported by the number of trucks scheduled by Defendants to pick up the goods (*see* ECF 146-2, Bonanti Rep. ¶ 7, at 31); identify Coast-to-Coast as the motor carrier even though Coast-to-Coast is a freight broker and not a motor carrier (*see id.* ¶ 12, at 32); indicate that the goods were to have been picked up in Compton, California and delivered to Brooklyn, New York, with a stopover in Cherry Hill, New Jersey, but there is no indication on the documents that the Gardena Facility was an intended stopover location (*see id.* ¶ 21, at 33); and bear different dates from the dates on which trucks were scheduled (*see id.* ¶ 27). Bonanti also points out that it would have been illogical to use the Gardena Facility as a "customary transshipment point" when transporting goods from Compton, California to Cherry Hill, New Jersey, since the Gardena Facility is located a half mile from Compton. (*See id.* ¶ 25.)

Plaintiff argues that Bonanti's testimony as to these opinions would, among other things, assist the factfinders in (1) concluding that the bills of lading were "deficient documents that do not represent actual shipments from Compton to Cherry Hill and that . . . there were never any [such] shipments" (ECF 150, Pl.'s Bonanti Opp. at 9-10), which is relevant to whether the Other Goods were "in transit"; (2) determining whether Gardena was a customary

transshipment point (*see id.* at 10), which also is relevant to whether the Other Goods were "in transit"; and (3) assessing whether Liberty's claims adjuster acted in good faith in denying coverage for the Container Goods and Other Goods when those goods were not "in transit" (*id.*). The third argument, while characterized as one relating to Defendants' counterclaims, is just another version of the argument that the Other Goods were not in transit, and so I do not believe it adds anything to Plaintiff's position. [15]

Opinions 7, 12, 21, and 27 provide no insights requiring an expert. Fact witnesses could testify that the bills of lading reflect more goods than could have been transported by the number of scheduled trucks (*see* ECF 146-2, Bonanti Rep. ¶ 7, at 31); identify Coast-to-Coast as the motor carrier even though Coast-to-Coast is a freight broker and not a motor carrier (*see id.*

---

[15]    Defendants take the position that Bonanti's remaining opinions about inconsistencies in the bills of lading reflect an impermissible effort by Plaintiff to import requirements for bills of lading into the Warehouse to Warehouse and Marine Extension Clause and Domestic Transit Coverage Endorsement through an expert. (*See* ECF 155, Defs.' Bonanti Reply at 1-3.) Defendants are refuting a strawman. Plaintiff's argument is not that the Destroyed Goods fall outside the Policy definition of goods "in transit" or "in the ordinary course of transit" because the Policy required the bills of lading to include certain information, but the information in question on the documents was inaccurate. Rather, Plaintiff is contending that the inaccuracies in the bills of lading demonstrate that that the documents were fraudulent – prepared to make it appear that the Destroyed Goods had been "in transit" or "in the ordinary course of transit" when they were actually being stored outside the Gardena Facility. However, Bonanti offers his remaining five opinions about defects in the bills of lading to support his conclusion that the documents were "fabricated" to hide the "real" reason the Destroyed Goods were outside the Gardena Facility, which Bonanti says was that Defendants had to move the goods after losing their lease on the warehouse in Compton, California. (ECF 146-2, Bonanti Rep. at 30.) Expert testimony may not interject the expert's "speculation regarding the state of mind and motivations of certain parties" and "inferences that [the expert] dr[ew] from other evidence in the case." *Highland Cap. Mgmt.,* 379 F. Supp. 2d at 469. Bonanti's opinion about the motivation for Defendants' decision to move the Destroyed Goods from Compton to the Gardena Facility is stricken from his reports, and he may not testify on that subject.

¶ 12, at 32); do not indicate that the Gardena Facility was an intended stopover location (*see id.* ¶ 21, at 33); and bear different dates from the dates on which trucks were scheduled (*see id.* ¶ 27). Bonanti's final opinion – that it would have been illogical to use the Gardena Facility as a transshipment point for goods coming from a warehouse in Compton, California since the Gardena Facility is located a half mile from Compton (*see id.* ¶ 25) – is a conclusion that the factfinders could draw without expert guidance. As such, Bonanti's remaining opinions should be stricken from his report. *See In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 194 (S.D.N.Y. 2009) (excluding an expert's testimony "about regulatory standards or alleged regulatory violations" and opinions that speculated about the "knowledge, motivations, intent, state of mind, or purposes" of defendant or its employees); *see also United States v. Amuso*, 21 F.3d 1251, 1263 (2d Cir. 1994) ("A district court may commit manifest error by admitting expert testimony where the evidence impermissibly mirrors the testimony offered by fact witnesses, or the subject matter of the expert's testimony is not beyond the ken of the average juror.").

****

Accordingly, as set forth above, Defendants' motion to exclude Bonanti's reports and testimony (ECF 144) is GRANTED.

II.    **Defendants' Experts**

  A.    <u>Barry Zalma</u>

    1.   Background and Opinions

Defendants retained Zalma "to testify as an insurance coverage and insurance claims

handling practices expert and to offer opinions as to whether Liberty . . . satisfied insurance

industry standards and practices, including those standards and practices set forth in New York

Insurance law and insurance regulations, the California Insurance Code, and the California Code

of Regulations." (ECF 134-1, Report of Barry Zalma ("Zalma Rep.") at 1.) Defendants offer

Zalma's opinions to support their counterclaims for bad faith, violation of the implied covenant

of good faith and fair dealing, and unfair business practices in connection with Plaintiff's

handling of their claim. (*See* ECF 152, Defs.' Mem. of Law in Opp. to Mot. To Exclude Expert

Testimony of Barry Zalma ("Defs.' Zalma Opp.") at 7-9.)

Zalma also submitted a rebuttal report addressing Curzio's report – both on issues

relating to Defendants' counterclaims and on whether the Other Goods were "in the ordinary

course of transit" at the time of the fire. (ECF 134-4, Zalma Rebuttal Rep.)

Zalma has over 56 years of experience in the insurance industry, having worked as a

lawyer, consultant, and expert witness in insurance-claims litigation, and having drafted and

adapted insurance policies for his clients. (*See* ECF 134-1, Zalma Rep. at 1.) Zalma's opinions on

Liberty's claims handling process are based on his experience, as well as, among other sources,

a best practices guide for claims handling offered by Liberty to its claims adjusters; Defendants'

claims file; California and New York statutes; and four deposition transcripts. (*See id.*, Ex. A, Zalma Rep. at 28.)

Zalma opines that "the customs and practice of the insurance industry" require investigation of a "claim of damage to cargo either in a warehouse or in transit . . . by an adjuster employed by the insurer or a licensed independent insurance adjuster." (ECF 134-1, Zalma Rep. at 22.) He concludes that Liberty's handling of Defendants' claims under the Policy "was one of the most inadequate, incomplete, unprofessional, and unlawful examples of claims handling" that he has seen in his decades of experience, and that Liberty's claims handling violated California law, industry custom and practice, and Liberty's own policies. (*Id.* at 21-27.) In particular, he faults Liberty for retaining a marine surveyor to investigate the losses rather than using its own investigator or hiring a licensed independent adjuster and for failing to correspond with the insureds before denying the claims. (*See id.*) Many of his opinions derive from Liberty's failure to comply with California law. (*See, e.g.*, *id.* at 25-26 (opining that Plaintiff "did not comply with the California Fair Claims Settlement Practices Regulations" and providing 12 examples); *id.* at 26 (opining that Plaintiff "failed to comply with the minimum standards established by the [California Insurance Code] and providing 14 examples).)

In his rebuttal report, Zalma opines that Liberty's claims handling violated its own best practices and was deeply deficient (*see* ECF 134-4, Zalma Rebuttal Rep. at 4-5); that Curzio

ignored the deficient investigation and that the Policy did not require bills of lading (*see id.* at 5-6); and that Liberty's claims handling violated New York and California law. (*See id.*)[16]

    2.  Analysis

        a.  *Qualifications*

Plaintiff argues that because Zalma lacks "knowledge and understanding of marine insurance," he should be precluded from opining on the Policy. (*See* ECF 133, Pl.'s Mem. in Supp. of Mot. To Exclude Zalma Rep. and Testimony ("Pl.'s Zalma Mem.") at 7-8.) Defendants respond that "Zalma need not be an expert in marine cargo insurance [in] order to discuss insurance industry standards, customs, and practices." (*See* ECF 152, Defs.' Zalma Opp. at 10.)

"Experts may . . . offer testimony discussing ordinary practices and usages in a particular industry," *Scott*, 315 F.R.D. at 46, especially where "the expert has educational and experiential qualifications in a general field closely related to the subject matter in question." *Am. Empire Surplus Lines Ins.*, 743 F. Supp. 3d at 538-39. Zalma's long experience in insurance claims handling is sufficient for him to opine on the claims handling in this case. Liberty's objections about Zalma's qualifications (*see* ECF 133, Pl.'s Zalma Mem. at 7-8) go to the weight of his opinions and not the admissibility. *See Ryan v. Nat'l Union Fire Ins. Co. of Pittsburgh, P.A.*, No.

---

[16]    Zalma's opinions on whether the contract required bills of lading would be considered if the Court determines that the Policy is ambiguous on whether the Policy required Defendants to prepare and submit bills of lading, but only to the extent the opinions are not excluded under *Daubert*. *See Morgan Stanley Grp.*, 225 F.3d at 275-76; *Ezrasons,* 89 F.4th at 396. Zalma's opinions on the sufficiency of Plaintiff's claims handling would be considered under all circumstances, except to the extent those opinions are excluded.

03-CV-0644 (CFD), 2010 WL 2232670, at *6 (D. Conn. June 2, 2010) (concluding that an insurance expert's "opinions regarding industry standards [we]re based on his years of experience in the insurance industry and as a claims handling expert" and that "countervailing testimony" would go to the weight of the opinion). I therefore decline to exclude Zalma's testimony on the ground that Plaintiff contends that Zalma "lacks expertise in the specialized area." *Am. Empire Surplus Lines Ins.*, 743 F. Supp. 3d at 538-39.

### b. Reliability

Plaintiff next argues that Zalma's opinions about Liberty's claims handling process are unreliable because they rely on an improper factual narrative drawn from an incomplete record; Plaintiff points out that Zalma was provided with four deposition transcripts only and was not made aware that additional depositions were taken. (*See* ECF 153, Pl.'s Reply in Supp. of Mot. To Exclude Zalma Rep. and Testimony ("Pl.'s Zalma Reply") at 2.) Defendants respond that Plaintiff's issues with the evidence that Zalma used in creating his report go to the weight of Zalma's testimony rather than its admissibility and therefore that those issues should be brought up on cross-examination. (ECF 152, Defs.' Zalma Opp. at 16 n.6.)

"Vigorous cross-examination" and "presentation of contrary evidence" are "the traditional and appropriate means" to attack Zalma's opinions. *Daubert*, 509 U.S. at 596; *see also R.F.M.A.S.,* 748 F. Supp. 2d at 269 (describing the tools that an opposing party can use at trial to "call[ ] into question the weight that the jury should accord [an expert's] testimony"). "[O]ur adversary system provides the necessary tools for challenging reliable, albeit debatable,

expert testimony." *Amorgianos*, 303 F.3d at 267. I therefore decline to exclude Zalma's testimony as unreliable.

### c. Relevance

Plaintiff objects to Zalma's opinions on several relevance-based grounds: (1) that Zalma's opinions about claims handling customs and practice "are based on or derived from" California law, which it contends does not govern (*see* ECF 133, Pl.'s Zalma Mem. at 8-12); (2) that Zalma offers impermissible legal conclusions about the New York Insurance Law (*see id.* at 21-22); and (3) that Zalma improperly provides a factual summary that could be constructed by a lay witness and improperly opines on matters reserved to the factfinders (*see id.* at 25-28).

### i. Opinions on California and New York Law

While the parties appear to agree that Plaintiff's claims under the Policy are governed by New York law (*see generally* ECF 108, Pl.'s S.J. Mem.; ECF 113, Defs.' S.J. Mem.), they dispute whether California or New York law governs Defendants' counterclaims: Defendants contend that California claims handling rules govern their extra-contractual tort claims (*see* ECF 152, Defs. Zalma Opp. at 14), while Plaintiff argues that Defendants have waived their argument that California law applies to the bad faith claims handling counterclaims (*see* ECF 153, Pl.'s Zalma Reply at 13-14).

Irrespective of the choice of law issue, Zalma should not be permitted to opine on either New York or California law, which falls to the Court to determine. *See Am. Empire Surplus Lines Ins.*, 743 F. Supp. 3d at 542. However, Zalma's interpretation of New York and California law forms the basis for his opinions. (*See, e.g.*, ECF 134-1, Zalma Rep. at 25-26 (providing 25

instances of Plaintiff's purported violations of the California insurance code); *id.* at 23 (relying on New York insurance regulations to opine on Liberty's claims investigation).) Even Zalma's descriptions of custom and practice of marine insurers are made with reference to statutes and regulations. (*See, e.g., id.* ("[I]n the customs and practice of inland marine insurers like Liberty, insurers will not retain an unlicensed person . . . knowing that doing so is a violation of the California Insurance Code and subjects the person retained and the insurer to a civil penalty.") Accordingly, to the extent that Zalma's opinions reflect interpretation of laws and regulations, his report must be excluded and his testimony prohibited.

ii.    Zalma's Summaries

A portion of Zalma's report is made up of a summary describing: Defendants' efforts to move goods from the Compton Warehouse to New Jersey (*see* ECF 134-1, Zalma Rep. at 14); the claims submitted by Defendants (*see id.*); documents demonstrating the delivery of the Container and Trailer Goods (*see id.*); and the value of the Destroyed Goods, the amounts tendered by Plaintiff, and the claims denied by Plaintiff (*see id.* at 14-15). Zalma also provides a chronology with negative commentary on Liberty's claims handling process. (*See, e.g., id.* at 16 (Plaintiff "ignor[ed] the Fair Claims Standards required by" California, New York, and Liberty Best Practices); *id.* at 17 (stating that Plaintiff's claims adjuster "fail[ed] to follow" Plaintiff's best practices and "knew or should have known that a professional independent adjuster would work effectively with a professional public insurance adjuster but failed or refused to retain the services of a licensed independent adjuster"); *id.* at 18 (contrasting what the marine surveyor "assum[ed]" with what he should have done and describing ways that Liberty's claims

investigation did not comply with California statutes and industry custom and practice); *id.* at 19 (stating that Plaintiff "[n]ever considered the possibility that the cargo outside the warehouse was in transit," failed to provide the required response to Defendants' proof of claim within 30 days, and did not conduct a "thorough investigation" of Defendants' claims).) Zalma's report also speculates as to Plaintiff's motivations. (*See id.* at 27 (opining that Plaintiff investigated Defendants' claims "with the apparent purpose to establish the Insureds were attempting fraud").)

Defendants respond that Zalma is permitted to use record evidence to "synthesize[ ] or summarize data," and that to identify "customs and practices and place them within a larger context of industry norms," Zalma "must lay a foundation that requires restating facts in evidence." (ECF 152, Defs.' Zalma Opp. at 19-20.) They rely on *Scott v. Chipotle Mexican Grill*, 315 F.R.D. 33 (S.D.N.Y. 2016), for its general principles about an expert's use of record evidence. However, Defendants but gloss over *Scott*'s application of those principles.

In *Scott*, the Court held that it was permissible for a business development expert to incorporate "record evidence," including "deposition transcripts and documents," to identify the restaurant-chain-defendant's business model's "practices and structures and place them within a larger context of industry norms," *id.* at 46, but that it was improper for the expert to opine on "motivation or intent" without "dispositive support," *id.* at 46-47. *See also Highland Cap. Mgmt.,* 379 F. Supp. 2d at 469 (finding inadmissible expert testimony that interjected into the record the expert's "speculation regarding the state of mind and motivations of certain parties" and "inferences that [the expert] dr[ew] from other evidence in the case"); *Sharkey v.*

*J.P. Morgan Chase & Co.*, 978 F. Supp. 2d 250, 253-54 (S.D.N.Y. 2013) (holding that an expert witness could not testify as to whether the plaintiff had a reasonable belief that the defendants' client was engaging in money laundering). *Scott* also held that "a party may not present an expert to the jury solely for the purpose of constructing a factual narrative based upon record evidence," or to "[s]imply rehash[ ] evidence about which an expert has no personal knowledge." *Scott*, 315 F.R.D. at 45 (collecting cases on impermissible use of record evidence by experts); *see also Taylor v. Evans*, No. 94-CV-8425 (CSH), 1997 WL 154010, at *2 (S.D.N.Y. Apr. 1, 1997) (striking an expert report that attempted to "present[ ] a narrative of the case which a lay juror is equally capable of constructing"). Accordingly, to the extent that Zalma's opinions encompass a summary of the facts of the case, with commentary on the motives of fact witnesses, his report must be excluded and his testimony prohibited.

****

After striking the impermissible portions from Zalma's report, rebuttal report, and testimony, there appears to be nothing to salvage. Accordingly, Plaintiff's motion to strike Zalma's reports and testimony is GRANTED, and Zalma is precluded from testifying.

B.    <u>Joseph B. Michels</u>

1.  Background and Opinions

Defendants retained Michels to opine on whether the Destroyed Goods were "in transit" or "in the ordinary course of transit" within the meaning of the Warehouse to Warehouse and Marine Extension Clause of the Policy and whether any delay in completing the shipments was within Defendants' control. (*See* ECF 137-1, Michels Rep. at 7.) Whether any

47

delay was within Defendants' control is relevant to the provision within the Warehouse to Warehouse and Marine Extension Clause that "it is a condition of this insurance that there shall be no interruption or suspension of transit unless due to the circumstances beyond the control of The Insured." (ECF 1-1, Policy § 15(e), at 13.) Defendants also retained Michels to opine on Plaintiff's handling of Defendants' claims. (*See* ECF 137-1, Michels Rep. at 21.)

Michels is a retired Air Force Colonel with "over 47 years of experience in supply chain and logistics operations," including "leadership and management of large multi-unit commercial, military and industrial warehouses, supply chain management, and trucking operations both domestically and internationally." (ECF 137-1, Michels Rep. at 5.) Michels' report discusses the nature of the parties, the text of the insurance contract and the events that occurred leading up to and after the fire and applies his experience to issues in this case. (*See generally id.*)

Michels opines that: (1) Plaintiff lacked standard definitions of terms about freight in the ordinary course of transit; (2) Plaintiff denied coverage based on subjective opinions rather than "fact-based processes and protocols"; (3) Plaintiff improperly required bills of lading for goods staged in the ordinary course of transit but not yet scheduled by a particular trucking company; (4) "the COVID-19 pandemic prevented the availability of sufficient and adequate interstate trucking carriers to provide the trucks to transport" the Destroyed Goods to New Jersey before the fire; and (5) the Destroyed Goods "were staged for delivery while in the ordinary course of transit and were not stored outside as alleged by" Plaintiff. (*Id.* at 27.)

Michels also provided a rebuttal report contesting the opinions in the Fox, Curzio, and Bonanti reports. (*See generally* ECF 137-2, Michels Rebuttal Rep.) As to Bonanti's report, Michels' rebuttal to Bonanti's report must be stricken, because Bonanti's report has been excluded. *See Golden Unicorn Enters., Inc. v. Audible, Inc.*, 682 F. Supp. 3d 368, 381 (S.D.N.Y. 2023) (finding that the testimony of a rebuttal expert "must. . . be excluded as irrelevant" after the principal expert's testimony had been precluded); *FedEx Ground Package Sys., Inc.*, 2018 WL 4961455, at *5 (excluding a rebuttal report as irrelevant after the report that it rebutted was excluded). Michels opines that Fox's report is irrelevant because it fails to consider cost and therefore provides a "false portrayal" of transport availability. (*Id.* at 6-8.) Michels briefly rebuts Curzio's report by stating that "[a]ll of the Day to Day Imports products destroyed in the yard fire were in the ordinary course of transit." (*Id.* at 8-9.)[17]

---

[17]     Michels' first two opinions, if not excluded, would be considered under all circumstances. Michels' opinions that the Destroyed Goods were "in transit" or "in the ordinary course of transit" within the meaning of the Warehouse to Warehouse and Marine Extension Clause of the Policy – both in his report and in his rebuttal to Curzio's report – would, if not excluded, be considered if the Court determines that the Policy is ambiguous on the meaning of the terms "in transit" or "in the ordinary course of transit." *See Morgan Stanley Grp.*, 225 F.3d at 275-76; *Ezrasons,* 89 F.4th at 396. And Michels' opinion, if not excluded, as to whether any delay in completing the shipments was within Defendants' control – both in his report and in his rebuttal to Fox's report – would be considered only if the Court determines that the Other Goods were no longer in transit; otherwise, there would be no reason to determine whether any delay in transit was within Defendants' control, which would lead to an exclusion of the loss for the Other Goods. (*See* ECF 1-1, Policy ¶ 15.)

2.  Analysis

    *a.  Qualifications*

Plaintiff asserts that Michels is not qualified to opine on insurance matters or claims

handling practices. (*See* ECF 136, Pl.'s Mem. in Supp. of Mot. To Exclude Michels Rep. ("Pl.'s

Michels Mem.") at 1.) Defendants respond that Michels is not being offered to opine on

insurance matters and that Michels is qualified as an expert on trucking, logistics and supply

chain management issues. (ECF 151, Defs.' Mem. in Opp. to Mot. To Exclude Michels Rep.

("Defs.' Michels Opp.") at 7-8.) Plaintiff replies that Defendants' position is an admission that

Michels cannot testify on insurance-related matters and that most of his report consists of

opinions about the insurance industry. (ECF 154, Pl.'s Reply Mem. in Supp. of Mot. To Exclude

Michels Rep. ("Pl.'s Michels Reply") at 11.)

I conclude that Michels' expertise in transportation logistics qualifies him to opine on

whether bills of lading are typically prepared for goods staged in the ordinary course of transit

but not yet scheduled by a particular trucking company; whether the COVID-19 pandemic led to

a lack of available trucks to transport the Destroyed Goods from California to New Jersey in

2021 before the fire; and how goods are typically "staged for delivery" as opposed to "stored"

outside a warehouse. *See, e.g.*, *Arista Recs.*, 2011 WL 1674796, at *3 (declining to exclude the

opinions of an expert with experience "in a general field closely related to the subject matter in

question").

However, Michels' background in transportation logistics does not qualify him to opine

on whether Plaintiff, an insurer, lacked standard definitions of terms about freight in the

ordinary course of transit: that assessment would require knowledge of standard definitions used in the insurance industry rather than in the transportation industry. Nor does Michels' background in transportation logistics provide him with the requisite expertise to opine on whether Plaintiff denied coverage based on subjective opinions as opposed to fact-based protocols: that too is an assessment that would require familiarity with practices and procedures in the insurance industry. *See Sec. & Exch. Comm'n v. Terraform Labs Pte. Ltd.*, 708 F. Supp. 3d 450, 468-69 (S.D.N.Y. 2023) (excluding expert testimony where there was not a close enough fit between the witness' expertise and the issues in the case).

Accordingly, Michels' first and second opinions – that Plaintiff lacked standard definitions of terms about freight in the ordinary course of transport and that Plaintiff denied coverage based on subjective opinions rather than fact-based protocols – are excluded. Both of those opinions relate to Defendants' counterclaims rather than Plaintiff's claims.

### b. Reliability

Liberty argues that, insofar as Michels qualifies as an expert in transportation logistics, his opinions are vague, conclusory, or unreliable under Rule 702. (*See* ECF 136, Pl.'s Michels Mem. at 1.) Defendants counter that Michels' opinions and methodology are based on sufficient facts or data and are the product of reliable principles and methods applied to the facts. (*See* ECF 151, Defs.' Michels Opp. at 10-14.) Plaintiff replies that Michels' methods were neither reliable nor reliably applied to the facts, at least with respect to Michels' fourth and fifth opinions (that the pandemic led to a lack of available trucks and that the Other Goods were staged for transport rather than storage). (*See* ECF 154, Pl.'s Michels Reply at 12-15.)

A "district court should consider the indicia of reliability identified in Rule 702, namely, (1) that the testimony is grounded on sufficient facts or data; (2) that the testimony is the product of reliable principles and methods; and (3) that the witness has applied the principles and methods reliably to the facts of the case." *Amorgianos*, 303 F.3d at 265. However, the Supreme Court has declared that the reliability inquiry for expert testimony is "flexible," and that depending on the nature of the testimony, reliability concerns may focus on different factors. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150 (1999) (explaining that expert testimony may rest "upon scientific foundations, the reliability of which [may] be at issue," or "the relevant reliability concerns may focus upon personal knowledge or experience," and concluding that because there are "many different kinds of experts," there are "many different kinds of expertise"); *see also Nicholas v. Bratton*, 376 F. Supp. 3d 232, 289 (S.D.N.Y. 2019) ("These factors . . . are not exclusive or unyielding . . . .").

"In cases where experts draw a conclusion from a set of observations based on extensive and specialized experience, the method [they employ] is the application of experience to facts." *Scott*, 315 F.R.D. at 50. Such testimony is testable under *Daubert* in the sense that it is "provable (or disprovable) by equivalent testimony by experienced participants in the industry." *Mahony v. JJ Weiser & Co., Inc.*, 04-CV-2592 (VM) (HBP), 2007 WL 3143710, at *6 (S.D.N.Y. Oct. 25, 2007). In such cases, courts often look to the expert witness' experience to determine their reliability. *See, e.g.*, *Am. Empire Surplus Lines Ins.*, 743 F. Supp. 3d at 541-42 (finding expert testimony reliable where an insurance expert applied 30 years of experience to the facts); *Pension Comm. of Univ. of Montr. Pension Plan v. Banc of Am. Sec., LLC*, 691 F. Supp.

2d 448, 464-65 (S.D.N.Y. 2010) (finding expert testimony on custom and practice in the hedge fund industry reliable where the expert witness has performed due diligence on a many hedge funds); *Seneca Ins. Co. v. Wilcock*, 01-CV-7620 (MHD), 2007 WL 415141, at *9 (S.D.N.Y. Feb. 5, 2007) (finding that a "long-time insurance industry executive['s]" testimony on the meaning of the words "loss" and "claim" in the insurance industry was reliable).

Michels has "47 years of experience in supply chain and logistics operations." (ECF 137-1, Michels Rep. at 5.) In light of Michels' experience and the "well-accepted principle that Rule 702 embodies a liberal standard of admissibility for expert opinions," *Nimely,* 414 F.3d at 395, I conclude that Michels' opinions are reliable.

### c.  Relevance

Liberty construes all but Michels' fourth opinion on availability of trucks to transport Day to Day Imports' products as impermissible opinions relating to coverage under the Policy. (*See* ECF 136, Pl.'s Michels Mem. at 5-6.) Defendants counter that Michels "will not be asked to opine on insurance issues, render legal opinions, or otherwise interpret the Policy." (ECF 151, Defs.' Michels Opp. at 2.) I have already concluded that Michels' first and second opinions are excluded because his background does not provide him with the requisite expertise. I therefore address whether Michels' third and fifth opinions – that Plaintiff improperly required bills of lading for goods staged in the ordinary course of transit but not yet scheduled by a particular trucking company and that the Destroyed Goods "were staged for delivery while in the ordinary course of transit and were not stored outside" – impermissibly usurp the role of the Court.

As formulated, the opinion that Plaintiff improperly required bills of lading for goods staged in the ordinary course of transit before scheduling by a trucking company assumes the conclusion that the Destroyed Goods were in transit under the terms of the Policy and therefore impermissibly opines as to a legal conclusion. *See Syntel Sterling Best Shores Mauritius Ltd. v. TriZetto Grp.*, 15-CV-0211 (LGS), 2020 WL 5822058, at *1 (S.D.N.Y. Sept. 30, 2020) ("[The expert witness] will not be allowed to provide any opinion on what he believes or assumes the law to be."); *Hayden v. Int'l Bus. Machs. Corp.*, 21-CV-2485 (VB), 2025 WL 1697021, at *9 (S.D.N.Y. June 17, 2025) (finding an expert report inadmissible where it assumed a legal conclusion); *Densberger v. United Techs. Corp.*, 297 F.3d 66, 74 (2d Cir. 2002) ("It is a well-established rule in this Circuit that experts are not permitted to present testimony in the form of legal conclusions.").

However, if the Court determines that the terms "in transit" and "in the ordinary course of transit" are ambiguous, it would be appropriate for Michels to opine on industry practice whether bills of lading are issued before a trucking company is scheduled for goods staged for transit. That opinion is within the expertise of a logistics expert such as Michels, and information on industry practice for issuing bills of lading would assist the triers of fact in determining whether the Destroyed Goods were in transit at the time of the fire. *See Sec. & Exch. Comm'n v. Tourre*, 950 F. Supp. 2d 666, 682 (S.D.N.Y. 2013) (finding that an expert witness could not testify as to legal conclusions but could testify as to industry custom and practice).

Similarly, the opinion that the Destroyed Goods "were staged for delivery while in the ordinary course of transit and were not stored outside" also is impermissibly premised on the

54

legal conclusion that those goods were "in the ordinary course of transit." *See In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d at 541 ("[A]n expert may give an opinion to help the jury decide an issue in the case, [but] he or she may not tell the jury what result to reach . . . ."). However, if the Court determines that the terms "in transit" and "in the ordinary course of transit" are ambiguous, it would be appropriate for Michels to opine on industry practice for staging goods for transit as opposed to staging goods for storage. That opinion falls within the expertise of a logistics expert such as Michels, and information on how goods are staged prior to transit versus how goods are staged for storage would help the factfinders assess whether the Destroyed Goods were in transit at the time of the fire. *See Pension Comm. of Univ. of Montr.*, 691 F. Supp. 2d at 474-76 (finding that an experienced hedge fund administrator could testify as to customs and practices in the hedge fund industry but could not testify as to legal conclusions).

Liberty does not challenge Michels' fourth opinion, the unavailability of trucks during the COVID-19 pandemic, on relevance grounds. (*See generally* ECF 136, Pl.'s Michels Mem.; ECF 154, Pl.'s Michels Reply.)

Michels' rebuttal report criticizes Fox's report for determining the availability of trucks without considering cost and concludes that Fox's report is unhelpful to the trier of fact. (ECF 137-2, Michels Rebuttal Rep. at 6-8.) "A rebuttal expert, by nature, criticizes the methodology and/or opinions of another." *Better Holdco*, 666 F. Supp. 3d at 381. It is proper rebuttal opinion for Michels to find fault in the underlying assumptions of Fox's report and explain how those assumptions lead to an incorrect conclusion. *See Capri Sun*, 595 F. Supp. 3d at 140. However,

Michels may not opine that Fox's report is unhelpful to the trier of fact or that Fox's report does not meet the requirements for expert testimony under Rule 702, and such testimony is stricken from the rebuttal report. *See id.* at 142 (excluding portions of an expert report that purported to guide the application of the *Daubert* standard for another expert and holding that "to the extent [the rebuttal expert's] terminology in court would imply that [the initial expert's] work falls below the legal threshold for admissibility, it may not be put before the jury").

Finally, Michels' rebuttal report briefly responds to Curzio's report, stating that "[a]ll of the Day to Day Imports products destroyed in the yard fire were in the ordinary course of transit." (ECF 137-2, Michels Rebuttal Rep. at 9.) This is an impermissible legal conclusion. *See Am. Empire Surplus Lines Ins.*, 743 F. Supp. 3d at 543 ("The interpretation of an insurance agreement is a question of law as to which expert testimony is not permitted"). Michels' evaluation of Curzio's opinions is stricken, and Michels may not testify in rebuttal to Curzio.

****

Accordingly, as set forth above, Plaintiff's motion to exclude Michels' reports is GRANTED IN PART, in that the opinions that Plaintiff lacked standard definitions of terms about freight in the ordinary course of transit and denied coverage based on subjective opinions rather than fact-based processes are stricken from Michels' reports, and Michels is precluded from testifying to those opinions; and the motion is further GRANTED IN PART, in that the opinions that Plaintiff improperly required bills of lading for goods staged in the ordinary course of transit before scheduling by a trucking company and that the Destroyed Goods "were staged for delivery while in the ordinary course of transit and were not stored outside" are stricken

from Michels' reports, and Michels is precluded from testifying to those opinions. The motion is otherwise DENIED IN PART, in that the opinions that there would not typically be bills of lading for goods staged in the ordinary course of transit but not yet scheduled by a particular trucking company; that as a result of the COVID-19 pandemic, there was insufficient trucking capacity to have transported the Destroyed Goods in 2021 before the fire; and explaining how goods are staged for delivery as opposed to storage are not stricken from Michels' reports, and Michels may testify to those opinions. With regard to Michels' rebuttal report, Plaintiff's motion is GRANTED IN PART, in that Michels' rebuttal of Bonanti is stricken because Bonanti's reports and testimony are excluded; the motion is further GRANTED IN PART, in that Michels may not opine that Fox's report is unhelpful to the trier of fact or that Fox's report does not meet the requirements for expert testimony under Rule 702, and Michels may not testify to that effect; and the motion is further GRANTED IN PART, in that Michels' rebuttal to Curzio's report is stricken, and Michels may not testify in rebuttal to Curzio. The motion is further DENIED IN PART, in that in rebuttal to Fox, Michels may criticize Fox's assumptions and conclusions, and Michels may testify to those opinions. [18]

---

[18]    Michels' remaining opinion as to whether any delay in completing the shipments was within Defendants' control – both in his report and in his rebuttals to Fox's report – would be considered only if the Court determines that the Other Goods were no longer in transit; otherwise, there would be no reason to determine whether any delay in transit was within Defendants' control, which would lead to an exclusion of the loss for the Other Goods. (*See* ECF 1-1, Policy § 15, at 13.)

## CONCLUSION

For the foregoing reasons:

- Defendants' motion to exclude Fox's reports and testimony (ECF 138) is GRANTED IN PART, in that Fox's opinion that the testimony of Defendants' freight brokers is not credible is stricken from Fox's reports, and Fox may not testify on the credibility of the freight brokers' testimony; and the motion is further GRANTED IN PART, in that Fox's opinion that Michels' opinion on the availability of trucks lacks supporting evidence is stricken from Fox's reports, and Fox may not testify that Michels' opinion on the availability of trucks lacks supporting evidence, although Fox may testify as to the specifics of why he believes Michels' conclusions are not supported by the evidence. The motion is otherwise DENIED IN PART. [19]

- Defendants' motion to exclude Curzio's reports (ECF 141) is GRANTED IN PART, in that Curzio's opinions on the meanings of the Policy terms, including but not limited to the terms "in transit" and "in the ordinary course of transit" and on whether a claims handler would reasonably deny the claims in this case based on Policy provisions, and on whether Defendants have demonstrated that their losses were covered under the Policy, are stricken

---

[19]     The opinions that are not excluded relate only to whether the Policy's condition of coverage that there be "no interruption or suspension of transit unless due to the circumstances beyond the control of The Insured" (ECF 1-1, Policy § 15(e), at 13) precludes coverage for the loss of the Other Goods because the delay in onward transit was due to circumstances within Defendants' control. (*See* ECF 148, Pl.'s Fox Opp. at 5.) Therefore, Fox's opinions would be considered only if the Court determines that the Other Goods were no longer in transit at the time of the fire; otherwise, there would be no reason to determine whether any delay in transit was within Defendants' control.

from his reports, and Curzio may not testify as to those subjects even in connection with opining on the sufficiency of Plaintiff's claims handling practices; and the motion is further GRANTED IN PART, in that Curzio's rebuttal report is excluded, and Curzio may not testify to the opinions therein. The motion to exclude is DENIED IN PART, in that Curzio's opinions about industry custom and practice, including but not limited to industry practice for documenting that claims had been shipped from outside the country and for documenting that goods were at a transshipment point between the point of origin and the destination are not stricken from his reports, and Curzio may testify on those subjects; and the motion to exclude is further DENIED IN PART, in that Curzio's opinions on the sufficiency of Plaintiff's claims handling are not stricken from his reports, and he may testify on that subject, except to the extent that those opinions entail statements about the meanings of any disputed Policy terms;[20]

- Defendants' motion to exclude Bonanti's reports and testimony (ECF 144) is GRANTED, and Bonanti is precluded from testifying;

- Plaintiff's motion to exclude Zalma's reports and testimony (ECF 132) is GRANTED, and Zalma is precluded from testifying; and

---

[20]    Curzio's remaining opinions that relate to whether the Destroyed Goods were "in transit" or "in the ordinary course of transit" within the meaning of the Warehouse to Warehouse and Marine Extension Clause of the Policy would be considered if the Court determines that the Policy is ambiguous on the meaning of those terms. *See Morgan Stanley Grp.*, 225 F.3d at 275-76; *Ezrasons,* 89 F.4th at 396. Curzio's remaining opinions on the sufficiency of Plaintiff's claims handling would be considered under any circumstances.

- Plaintiff's motion to exclude Michels' reports is GRANTED IN PART, in that the opinions that Plaintiff lacked standard definitions of terms about freight in the ordinary course of transit and denied coverage based on subjective opinions rather than fact-based processes are stricken from Michels' reports, and Michels is precluded from testifying to those opinions; and the motion is further GRANTED IN PART, in that the opinions that Plaintiff improperly required bills of lading for goods staged in the ordinary course of transit before scheduling by a trucking company and that the Destroyed Goods "were staged for delivery while in the ordinary course of transit and were not stored outside" are stricken from Michels' reports, and Michels is precluded from testifying to those opinions. The motion is otherwise DENIED IN PART, in that the opinions that there would not typically be bills of lading for goods staged in the ordinary course of transit but not yet scheduled by a particular trucking company; that as a result of the COVID-19 pandemic, there was insufficient trucking capacity to have transported the Destroyed Goods in 2021 before the fire; and explaining how goods are staged for delivery as opposed to storage are not stricken from Michels' reports, and Michels may testify to those opinions. With regard to Michels' rebuttal report, Plaintiff's motion is GRANTED IN PART, in that Michels' rebuttal of Bonanti is stricken because Bonanti's reports and testimony are excluded; the motion is further GRANTED IN PART, in that Michels may not opine that Fox's report is unhelpful to the trier of fact or that Fox's report does not meet the requirements for expert testimony under Rule 702 of the Federal Rules of Evidence, and Michels may not testify to that effect; and the motion is further GRANTED IN PART, in that Michels' rebuttal to Curzio's report is stricken, and

Michels may not testify in rebuttal to Curzio. The motion is further DENIED IN PART, in that

in rebuttal to Fox, Michels may criticize Fox's assumptions and conclusions, and Michels

may testify to those opinions.[21]

The Clerk of Court is respectfully requested to terminate ECF 132, 135, 138, 141, and

144.

Dated: July 29, 2025
      New York, New York

SO ORDERED.

**ROBYN F. TARNOFSKY**
**United States Magistrate Judge**

---

[21] Michels' remaining opinion as to whether any delay in completing the shipments was within Defendants' control – both in his report and in his rebuttals to Fox's report – would be considered only if the Court determines that the Other Goods were no longer in transit; otherwise, there would be no reason to determine whether any delay in transit was within Defendants' control, which would lead to an exclusion of the loss for the Other Goods. (*See* ECF 1-1, Policy § 15, at 13.)